IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FRANCINE HELTON,                    )
                                    )
            Plaintiff,              )
                                    )      CASE NO.  1:10-CV-0857
v.                                  )
                                    )
AT&T, INC., *et al.*,               )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the three-day nonjury trial for Plaintiff Francine

Helton's claims against Defendants AT&T Inc. and AT&T Pension Benefit Plan ("Plan") for

pension benefits.  This case concerns Defendants' alleged failure to notify Plaintiff of a change

in the Plan's early retirement eligibility policy, resulting in Plaintiff's alleged loss of eight years

of monthly payments to which she was entitled.

On August 8, 2010, Plaintiff filed her Complaint in this action, asserting the following

claims:  (1) improper denial of retroactive benefits (Count I); (2) violations of ERISA's

disclosure requirements (Count II); (3) breach of fiduciary duty to keep beneficiaries informed

(Count III); and (4) failure to provide requested information (Count IV).  Plaintiff requested both

equitable and compensatory relief.  Specifically, she requested that the Court: (1) declare that the

AT&T Employees' Benefit Committee abused its discretion in denying Ms. Helton's claims for

retroactive benefits when AT&T failed to disclose until September 2009 that Ms. Helton was

entitled to receive an unreduced pension benefit beginning in November 2001 at the age of 55;

(2) declare that AT&T breached its duties under ERISA § 102, 29 U.S.C. § 1022, to

understandably disclose changes in the eligibility requirements in a summary of material

1

modification ("SMM") or an updated summary plan description ("SPD") and to distribute those summaries to participants with deferred vested pensions like Ms. Helton who were affected by the changes; (3) declare that AT&T breached its fiduciary duties in ERISA § 404, 29 U.S.C. § 1104, to keep beneficiaries informed; (4) declare that AT&T has unlawfully failed to produce requested documents as required by ERISA § 502(c)(1) and 29 C.F.R. 2560.503-1; (5) order AT&T to pay $121,563.90 to Ms. Helton ($1,279.62 per month between November 2001 and September 2009), plus interest on the monthly payments from the date each payment was due; (6) order AT&T to pay Ms. Helton $110 per day from the date of its refusal to supply requested records in accordance with ERISA § 502(c)(1), 29 C.F.R. 2560.503-1 and 29 C.F.R. 2575.502c-1; (7) award such other relief as the Court deems appropriate to ensure receipt of all retirement benefits and other amounts required to give effect to the Court's declarations; and, finally, (8) order Defendants to pay Plaintiff's attorneys' fees and expenses.

On June 3, 2011, Defendants moved for summary judgment on all counts. After granting Plaintiff's request for more discovery and allowing for supplemental briefing pursuant to Federal Rule of Civil Procedure 56(d), by Order dated August 10, 2011, the Court granted in part and denied in part Defendants' Motion for Summary Judgment. Specifically, the Court granted Defendants' Motion for Summary Judgment as to Plaintiff's claim for failure to provide requested information (Count IV) and denied Defendants' Motion for Summary Judgment as to Plaintiff's three other claims (Counts I-III).

Based on these remaining claims, the following issues are before the Court. The first issue is whether the Plan abused its discretion in denying Plaintiff's claim for pension benefits from when became eligible when she turned 55 years old (Count I) after finding that Plaintiff had been properly notified of the change in the Plan's eligibility requirements. The Court holds that

the Plan abused its discretion in denying Plaintiff's claim because it did not engage in a reasoned and principled decision-making process, and the determination is not supported by substantial evidence. The second issue is whether Defendants failed to comply with ERISA's disclosure requirements (Count II) because she was not properly notified of the material changes to the Plan in a timely manner. The Court holds that Defendants failed to comply with ERISA's disclosure requirements because they failed to employ a method of distribution that was reasonably calculated to ensure actual receipt in sending out the requisite disclosures of the material changes to the Plan. The third issue is whether Defendants breached their fiduciary duty (Count III) by failing to keep Ms. Helton informed of changes to the Plan. The Court holds that Defendants breached their fiduciary duty by failing to respond to or correct Ms. Helton's apparent misunderstanding when she asked whether it was correct that she was not eligible to receive benefits until age 65. However, the Court holds that Plaintiff is not entitled to monetary damages as a remedy because double recovery of retroactive benefits is not appropriate equitable relief for Defendants' violation.

## I.   STANDARD OF REVIEW

In a non-jury case, the court must make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a)(1). The trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable. *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957) (citation and internal quotation marks omitted). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Id.* (citation and internal quotation marks omitted); *see Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*,

56 F.3d 556, 567 (4th Cir. 1995) (internal quotation omitted) (stating that that factfinder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964).

To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. *United States ex rel. Belcon, Inc. v. Sherman Const. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986) (citation omitted). The court must support its rulings by spelling out the subordinate facts on which it relies. *Id.*

> The language of Rule 52 has been construed
>
> not to require a court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence.

*Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962). This rule does not require that the trial court set out findings on all the myriad factual questions that arise in a case. *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 433 (5th Cir. 1977). As to whether findings of fact are sufficient depends upon the particular facts of each individual case, and no general rule can govern. *Darter*, 301 F.2d at 75.

## II. FINDINGS OF FACT

### A. MS. HELTON'S EMPLOYMENT WITH AT&T

Plaintiff Ms. Francine Helton was born in October 1946. Ms. Helton began working for AT&T on June 30, 1980. Plaintiff has had the same home address in Arlington, Virginia since at least 1987. As of January 1, 1997, Plaintiff was on the active roll of a participating company in the Plan. In approximately April 1997, Plaintiff took an unpaid leave of absence along with vacation time to open a restaurant called Flavors. Ms. Helton opened her restaurant on April 19, 1997, which she has run since then with the help of her two sons. Plaintiff did not return to work after her leave of absence. Ms. Helton testified that, at the request of AT&T, she submitted a letter of resignation effective May 31, 1997, formalizing her termination with the company. During the time she was out on leave or vacation, she was still employed by AT&T. Ms. Helton's employment records have since been destroyed.

At that time, Plaintiff was a participant in AT&T's pension plan, which was established and is maintained by AT&T, and which provides retirement income to its employees. Ms. Helton was a deferred vested pensioner of the Legacy AT&T Management Program of the AT&T Pension Benefit Plan because her employment ended when she was age 50, and she did not have 25 years of service at the company. Moreover, because she did not have 20 years of service, under the terms of the Plan, she was not eligible to begin receiving even a substantially reduced pension before age 65.

Plaintiff did not request any information about her pension benefits at the time she left AT&T because she "always understood" that she would not be eligible to receive pension benefits until she reached age 65. This was general knowledge she had from when she joined the Plan and from the Plan's summary materials. However, in 1997, Defendants introduced a

Special Update to the Plan, which included a change to the "pay-base average period" used to calculate benefits and which allowed participants to elect their benefits at age 55 without any reduction for age ("Special Update"). The Special Update took effect on August 1, 1997.

B. MAILINGS ABOUT THE SPECIAL UPDATE

The Plan's denial of Ms. Helton's claim was based on its finding that an April 28, 1997 letter and the 1998 and 2004 SPDs were sent to Ms. Helton and contained information about the Special Update, from which she would have been aware of the changes to the eligibility requirements. Ms. Helton claims that she did not receive these documents.

At trial, Mr. Edwin Adam testified about these three mailings. Mr. Adam worked for Universal Mailing Services ("UMS"), which provided mailing services for Defendants from the early 1990s to approximately 2007. UMS mailed the April 28, 1997 letter and the 1998 and 2004 SPDs. According to Mr. Adam, AT&T identified the individuals to whom mailings would be sent. Usually, the process involved in coordinating an AT&T mailing would proceed as follows. First, he would receive a letter or email from AT&T about a new mailing. He would then meet with a person from AT&T to identify the documents that would need to be distributed and set a mailing file of individuals to whom the mailing would be sent. The individuals and their corresponding address information would be extracted from AT&T's system. For example, if AT&T wanted to send a mailing to active employees, it would extract the names and address information of all individuals from its system, who were designated as active employees. A mail file would then be created. UMS would print the materials to mail and discuss the time frame for "purifying" the mail file to ensure that the addresses were correct.

During the "purification" process, UMS would use special software from the United States Postal Service to verify the addresses of each individual on the mailing list. All correct

6

addresses were accepted, and any incorrect addresses were sent back to AT&T for correction. AT&T would then send UMS the corrected addresses. There was no testimony as to what happened when a person's address on the mailing list was incorrect, and AT&T did not correct the address. At trial, an example of a mailing that involved approximately 14,000 errors was presented to the Court, demonstrating that large numbers of errors in the mailing process were not uncommon. Each of the mass mailings was sent via third class mail with return receipt requested. The United States Postal Service performed "spot checks" of the mail sacks to ensure there were enough packages being distributed in accordance with the final mail file.

### 1. APRIL 28, 1997 LETTER

The Committee's denial of Ms. Helton's claim stated that she was in the class of people to whom an April 28, 1997 letter was sent regarding the Special Update. Ms. Stoia, a former AT&T employee, testified that she was involved in developing the communication plan to inform plan participants of the Special Update. A distribution matrix was created that identified the communications that would be sent out and the class of participants to which each communication would be distributed. The April 28, 1997 letter was the first communication that was sent out regarding the Special Update and included key dates, facts, and when other information would be available. The April 28, 1997 letter was sent to active management employees, which category was defined as anyone on the employee roll on January 1, 1997, and included those on leaves of absence. The employee's designation in the Asset Database, which AT&T used for its human resources functions to maintain AT&T employee information, determined whether an individual was an active employee. The Asset Database was distinct from the Pension Service database, which contained information about pensioners. The mail tape for this communication was drawn from the Asset Database.

Ms. Stoia did not know whether individuals on unapproved leaves of absence would fall within the group of individuals to whom this letter was sent, or how either approved or unapproved leaves of absence would be characterized in the Asset Database.   Notably the matrix was created in April 1997, so the mailing tape would have been drawn some time in April when Ms. Helton could have been on her leave of absence.   There was no evidence of how Ms. Helton was designated in the system at any time, but particularly when she was on her leave of absence, from which she did not return to work before she resigned.   In fact, there was no evidence of how the individuals designated for this mailing were extracted from the system.   Moreover, there was no evidence of UMS' file with respect to this mailing or a mailing list of individuals to whom this letter was distributed.

### 2. 1998 SPD

The Committee's denial of Ms. Helton's claim stated that she would have received the 1998 SPD, which also contained information about electing benefits at age 55 without reduction. There was no evidence of UMS' file for this mailing or a list identifying the individuals to whom the mailing was sent.   Further, Mr. Adam testified that the 1998 SPD was sent to active management employees, which did not include deferred vested pensioners.   He explained that the deferred vested would have been part of a pensioner group that would have their own unique pension SPD.   Ms. Helton does not recall receiving a copy of the 1998 SPD.

Ms. Helton had the opportunity to review the SPD after this litigation began and claims that, even if she had received it, it was not clear where she could find information about the changes to the eligibility requirements, and the information was difficult to understand.   She testified that there was no information explaining that a person was now eligible to receive benefits at age 55.

8

### 3.  2004 SPD

The Committee's denial of Ms. Helton's claim stated that she would have been sent the 2004 SPD, which also contained information about the Special Update. Mr. Adam testified that the 2004 SPD was sent to active management employees, not deferred vested or other pensioners. Ms. Helton does not recall receiving a copy of the 2004 SPD. Again, she testified that, even if she had received it, she would not have been able to find the information about the changes to the eligibility requirements based on the table of contents.

### C. 2001 COMMENCEMENT PACKAGE

The Committee's denial of Ms. Helton's claim stated that Ms. Helton requested and received a calculation for a commencement package in 2001. Through the designated deposition testimony of Ms. Martha Solorzano, evidence was admitted that customer service representatives in the Pension Service Center would frequently answer questions about pensions over the phone, but they did not generate benefits calculations or begin commencement packages for Plan participants unless the participant requested such information. When a Plan participant requests a calculation of benefits, the representative would request a manual calculation. When the calculation was received, she would put together a 1997 deferred vested pensioner package ("DVP package"), in which she would include the calculation. After making copies for Pension Service Center records, she would put all of the information into an automatically addressed envelope, and the mailroom would pick it up and mail it.

The Pension Service Center system case notes for Ms. Helton contain an entry dated April 16, 2001 by customer service representative Martha Solorzano indicating that Laurie Banwart received an email request on March 14, 2001 from a former employee requesting pension information. The entry continues, stating that Laurie Banwart forwarded the email

request to Larry Moellers on March 23 to respond to the employee regarding her pension. That same entry states further that Larry then forwarded the email message printout for Martha Solorzano to handle, and she submitted a request to the manual calculation team for a pension calculation with an effective date of June 1, 2001.  The next two entries indicate that the requested manual calculation was submitted to Martha Solorzano on April 17, 2001, and that it was mailed out on April 20, 2001.  A July 23, 2001 case note entry indicates that the commencement package had not been returned, and, therefore, the calculation was destroyed.

Despite these case note entries, a separate screen shot entitled "Commencement, Service" shows that the calculation was executed on April 16, 2001, but there was no entry that the calculation was mailed, which the screen indicates was done for calculations that were requested in 2009.  Plaintiff testified that she never requested or received a benefits calculation or commencement package in 2001.

Notably, AT&T employee Diane Ahlin sent an email dated March 14, 2001 to AT&T's Pension Service Center stating: "I know that my ncs is 6-30-80 but I am not quite sure of my last date of employment.  Can you please let me know.  And is it true that I am not entitled to any pension benefits until I reached [sic] the age of 65."  Ms. Helton's name and social security number appeared below the questions.  Even though Ms. Helton does not recall directly communicating these questions, she testified that she did have these questions.  The Court finds that Diane Ahlin was forwarding these questions on behalf of Ms. Helton because of the use of the first person and the inclusion of Ms. Helton's name and social security number.  There is no record that a response to these questions was ever sent to Ms. Helton, and Ms. Helton testified that she was never provided with information in response to these questions.  Moreover, it was the practice of the Pension Service Center to respond to questions in the same manner they were

received.  Thus, if a question came in by email, it would be answered by email.  However, there is no record of any response, email or otherwise.

D. <u>2009 COMMENCMENT PACKAGE</u>

In July 2009, as she neared age 65, Plaintiff called the Pension Service Center and requested a pension calculation from the Pension Service Center to see how much she would receive when she turned 65 years old.  The representative did not inform her that she was already eligible to commence receipt of her pension benefits, and that she had been eligible since she turned 55.

On August 18, 2009, Plaintiff called the Pension Service Center again and told a customer service representative that she had not received the July 31, 2009 calculation.  The representative checked the system records and told her that it could take up to 30 days to send the calculation.  The representative told her that the calculation had actually been completed the day before and was going to be mailed out that day.  The Pension System screen shots indicate that packages were sent out on July 31, 2009, August 18, 2009, and August 31, 2009.  Plaintiff received the package dated August 31, 2009 by certified mail, which contained a calculation dated August 18, 2009.  Ms. Helton commenced her pension, receiving $1,279.62 per month.

On September 8, 2009, Plaintiff called the Pension Service Center and spoke with representative Martha Solorzano about her pension.  She asked if the pension amount would change when she turned 65 and was told that her pension reached its maximum value when she turned 55, and that the amount would now remain the same.  Plaintiff told Ms. Solorzano that she did not know before she received this commencement package that she had been eligible to start receiving benefits at age 55.  She had been told that she could not receive the pension until age 65.

11

In response, Ms. Solorzano told Plaintiff that she had been mailed a commencement package in 2001 that Plaintiff did not fill out.  Plaintiff responded that did not recall receiving the 2001 commencement package; however, she probably did get it if it was sent out like Ms. Solorzano said, and that she probably did not even pay attention to it.  She stated "that's the story of my life.  I always miss the boat.  I'm always standing at the pier."

On September 15, 2009, Ms. Helton had a conference call with customer service representative Ms. Nancy Cordina.  Ms. Cordina confirmed that AT&T had mailed a benefit commencement package to Ms. Helton on August 18, 2009 and had to re-mail it on August 31, 2009.  She also told Ms. Helton that the Plan's changes to the eligibility requirements were highly publicized to all employees with mailings, newsletters, and inter-office announcements.

E.  <u>PLAINTIFF'S CLAIM FOR, AND PLAN'S DENIAL OF, BENEFITS</u>

In a letter to the Plan Administrator dated September 15, 2009, Plaintiff stated: "I always understood that I would not be eligible until the age of 65 based on the benefit plan summary." She further explained that she was not aware that the Plan's eligibility requirements changed, and that she could have been receiving benefits at age 55 with no reduction.  She stated that she had been on a leave of absence prior to her resignation date and only had the prior summary plan as a reference.  She wrote that she had been told that she was sent a notice in 2001, but that she had not received that notice.  She declared: "If I had known that I could receive my benefits at age 55, I certainly would have applied, there would be no reason not to since there was no reduction and it was frozen and would not increase."

Plaintiff's request was treated as a claim for additional pension benefits under the Plan and was denied by the Plan administrator on December 16, 2009.  In the letter, the administrator explained that, to commence benefits, a former employee must contact the Pension Service

Center to request a commencement package, and that pensions are paid on a forward going basis with no provision for the payment of retroactive benefits. In support of its denial, the administrator wrote that information about these changes was sent in an April 28, 1997 letter to all management employees and in the 1998 and 2004 SPDs. Moreover, the administrator wrote: "[o]ur records also confirm that in April 2001, a pension commencement package was sent to you but was never returned to the PSC."

On December 29, 2009, Plaintiff appealed the Plan administrator's decision to deny her retroactive benefits. In her letter, she stated that she did not receive the April 28, 1997 letter and that, if it was sent within the company, she would not have received it because she was on a leave of absence at that time. Moreover, a copy of the letter that she found on the internet did not contain details on "eligibility for an early pension." She also wrote that she never received a benefit calculation in April 2001, and that she "never received any information about the changes in the pension plan during the years from 1997 to 2009." She explained that it was not until she requested and received a calculation in 2009 that she learned of her eligibility. She concluded that the failure to properly notify her of the changes deprived her of the opportunity to request pension payments unreduced or reduced from 1998 to 2009, and that it was "inconceivable and illogical to think that I would not take advantage of the opportunity to commence pension payments if I was aware of my eligibility."

Appeals of plan administrator decisions are addressed by AT&T's Benefit Plan Committee, which consists of five AT&T human resources vice presidents, and which is assisted by AON Human Resources Consulting ("AON"). When the Plan administrator's decision is appealed, a consultant of the Plan administrator compiles the materials that the Committee would need to make its determination. In addition to compiling the claim and denial communications,

the consultant prepares a memorandum that summarizes the facts and issues and that provides information that may be relevant to a particular claim. Ms. Holland, a member of the Committee, testified that she would review the materials received and inquire further if she believed that additional information is necessary for the Committee to consider to make a determination. Once all information is obtained, the Committee meets to discuss each case and votes on whether to approve or deny the claim. Ms. Holland then sends out a decision letter based on the Committee's decision.

In this case, Ms. Holland testified that she had conversations with Ms. Loretta Hendren, a consultant for the Plan Administrator about Ms. Helton's appeal. She was curious about whether there were any mailing issues, such as a change of address, that would have created a problem in sending her materials. Ms. Holland received information confirming Ms. Helton's address and that it had remained unchanged for the time period at issue. Ms. Holland did not question how Ms. Helton was characterized in the system. Ms. Holland testified that she asked Ms. Hendren about Ms. Helton's leave of absence, and there were no records that Ms. Helton took a leave of absence. However, Ms. Holland testified that, if the length of the leave was for 30 days or less, it would not be reflected in the system. Moreover, she did not check the records or learn that, in fact, the records had already been destroyed. In addition, Ms. Holland did not ask, in fact "did not even think to ask", to see mail files or otherwise ascertain that Ms. Helton was on the mailing lists at issue or that the mailing was actually sent to Ms. Helton.

By letter dated March 22, 2010, Plaintiff's appeal for retroactive benefits was denied because she did not request to receive an unreduced monthly pension prior to turning 65, even though the Plan had mailed to her home address the April 28, 1997 letter, 1998 and 2004 SPDs and the 2001 97 MGMT DVP Commencement Package, which notified Plaintiff of the Special

14

Update and indicated that Plaintiff could take such action. Further, the Committee determined that it did not have the authority to provide retroactive pension benefits.

Ms. Holland testified that the only basis for the Committee's determination that the notifications were sent to Ms. Helton was that they "should have" been, and she relied upon the representations of the administrator because it was the administrator's job to inquire into such matters. Further, the only evidence as to the mailing of the 2001 Commencement Package were the computer records from the Pension Service Center. Finally, Ms. Holland testified that, while benefits are generally conferred prospectively, the Committee could have awarded retroactive benefits if Ms. Helton had a valid claim.

## III. CONCLUSIONS OF LAW

### A. COUNT I

The Court holds that the Plan administrator's denial of retroactive benefits was not reasonable and, therefore, was an abuse of discretion. In reviewing the denial of benefits under an ERISA plan, a district court's first task is to consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination. *DuPerry v. Life Ins. Co. of N. Am.*, 632, F.3d 860, 869 (4th Cir. 2011); *see Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 340-341 (4th Cir. 2000). When an ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the administrator's decision for abuse of discretion. *DuPerry*, 632 F.3d at 869; *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 629-30 (4th Cir. 2010) (citation omitted).

Under this standard, a court will not disturb a plan administrator's decision if the decision is reasonable, even if the court would have come to a contrary conclusion independently.

15

*Williams v. Metropolitan Life Ins. Co.*, 609 F.3d at 630 (citation omitted).  "To be held reasonable, the administrator's decision must result from a deliberate, principled reasoning process and be supported by substantial evidence." *Id.* (citation and internal quotation marks omitted).  Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *DuPerry*, 632 F.3d at 869 (citation and internal quotation marks omitted).

The United States Court of Appeals for the Fourth Circuit identifies eight nonexclusive factors for courts to consider in reviewing the reasonableness of a plan administrator's decision: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Id.* (citing *Booth*, 201 F.3d at 342-43).

Here, the Plan's determination was not reasonable because it was not based on a reasoned, principled decision-making process and was not supported by substantial evidence; thus, the Plan abused its discretion in denying Plaintiff's claim.  Plaintiff's claim was denied based on the determination that Plaintiff received proper notice of the Special Update. Specifically, the Benefit Plan Committee found that Plaintiff was sent the April 28, 1997 letter because "she was an active employee on that date," her address remained the same since at least 1988, and there was no indication that mail had been returned as undeliverable.  Further, the Committee found that Ms. Helton requested and was sent a pension commencement package in

2001, which she never returned. In addition, without setting forth any findings as to Defendants'
mailing procedures, the Committee found that Plaintiff "should also have received copies of the
1998 and the 2004 AT&TMPP (sic) Summary Plan Descriptions, which provided information on
the Special Update and when participants could commence their package." Finally, the
Committee found that, on August 31, 2009, an October 1, 2009 pension commencement package
was sent to Plaintiff, which she commenced on the effective date. The Committee acknowledged
Plaintiff's assertions that she did not (1) receive the 1997 letter or the SPDs or (2) request or
receive a commencement package in 2001, but it did not give weight to this evidence or set forth
any analysis as to how these assertions impacted its determination. Based on these findings, the
Committee upheld the denial of her claim.

The Plan's denial of Plaintiff's claim was an abuse of discretion for two reasons. First,
the Plan's decision was not reasonable because it was not based on a reasoned, principled
decision-making process. The denial was based on the finding that the Plan sent Ms. Helton
various notifications regarding the Special Update. However, neither the Plan nor the
Committee evaluated the process by which notifications were allegedly sent to Ms. Helton. *See*
29 CFR § 2520.104b-1 (requiring the plan administrator to furnish notices by measures
"reasonably calculated to ensure actual receipt of the materials"). There is no evidence that the
Plan administrator inquired about or evaluated the mailing procedures, and the Committee
seemed to rubberstamp without question the administrator's assertions that the materials were
sent. The Committee did not inquire into the mailing process; in fact, Ms. Holland testified that
she relied upon the administrator's assertions that the notifications were sent to Ms. Helton.
However, had the Committee engaged in some investigation into the process, they would have
discovered information, such as the fact that there were multiple mailings of the package of

2009, that should have been taken into account before simply rubberstamping the administrator's information that such notifications were sent.

In addition, even though Ms. Holland confirmed that Ms. Helton's address was correct and had remained the same for the time period at issue, the Committee did not inquire as to whether Ms. Helton was or would have been included in the category of individuals designated to be sent a particular notification.  In fact, they could not have done so because her employment records had been destroyed.  This is particularly noteworthy with respect to the April 28, 1997 letter, which was purportedly sent to active management employees, because there is no evidence that Ms. Helton was designated as an active management employee during that time, given that she was on an unpaid leave of absence from which she did not return prior to termination from the company.

Moreover, the Committee's acceptance of the Plan's assertions was done in the face of Ms. Helton's consistent assertions that she never received any of these materials and never requested a 2001 commencement package as the administrator indicated was requested and sent.  Ms. Helton's position, which was supported by other circumstantial evidence.  For example, the March 14, 2001 email did not contain a request for a commencement package.  In addition, there were multiple phone calls with Pension Service Center representatives in which she consistently maintained that she had never received any information about and was not otherwise aware of the Special Update.  Her position and the evidence supporting her position were not given any weight or consideration in the decision-making process.  Thus, the decision was not based on a reasoned, principled decision-making process and was, therefore, unreasonable, because the Committee did not inquire into or evaluate the process by which the Plan allegedly distributed

the notifications to Ms. Helton, and because Ms. Helton's evidence was not given any weight or consideration.

Second, the Plan administrator's decision was not reasonable because it was not supported by substantial evidence.  The alleged distribution of the notifications is not supported by substantial evidence because there is no evidence demonstrating that the Plan used distribution methods that were "reasonably calculated to ensure actual receipt of the materials," and, as stated above, it appears the Committee simply rubberstamped the Plan's factual assertions without reference to any evidence in support thereof.  In fact, Ms. Holland testified that the basis for the Committee's decision that she was sent such materials was in reliance upon the Plan administrator's representations, and, therefore, they "should have" been sent to her. Notably, there are no physical records of any mailing, mailing lists,[1] or other business records indicating that these materials were mailed to Ms. Helton at all, and certainly no evidence specifically showing that the materials were sent to Ms. Helton at her home address, as Defendants claim. As set forth in one of the screen shots of the Pension Service System, Defendants have the option of selecting an employee's home, office, or other location as the employee's mailing address, and there is no indication that Ms. Helton's home was selected.  In fact, the only screen shot indicating Ms. Helton's home address has an effective date of 2007, which does not demonstrate that this was the address used in the alleged mailings in 1997, 1998, 2001, or 2004. Moreover, the testimony of Ms. Stoia and Mr. Adam do not speak to whether Ms. Helton was included on the list of individuals to whom the mailings were to be distributed or whether her home address was the address selected.

---

[1] Defendants submitted into evidence a mailing list that was purportedly for the 2004 SPD mailing, which contained Ms. Helton's name and address.  However, Defendants failed to have any witness identify this mailing list as that which was used for the mailing of the 2004 SPD.

Further, there is not substantial evidence to support the Committee's determination that she was sent the April 1997 letter because there is no evidence that Ms. Helton was designated in the system as an active management employee at the time of the mailing, which was around the time she was on unpaid leave. Ms. Helton testified that she did not receive this letter, and there is no other physical evidence to the contrary.

In addition, there is not substantial evidence to support the finding that Ms. Helton was sent the SPDs. According to Mr. Adam's testimony, the SPDs were only sent to active management employees, and Ms. Helton was not an active management employee in 1998 or 2004. Again, Ms. Helton maintains that she did not receive the SPDs, and there is no evidence to the contrary.

The Committee's findings as to the circumstances surrounding the alleged request for, and receipt of, a commencement package in 2001 also are not supported by substantial evidence. There is no evidence that Ms. Helton requested a commencement package in 2001 aside from the case notes referring to a March 2001 email. The March 14, 2001 email related to Ms. Helton referenced in the case notes does not contain any such request and instead asks whether it was true that she was not eligible for benefits until age 65. Moreover, Ms. Banwart testified in her deposition that a question communicated via email would be responded to via email, which undermines the finding that a commencement package was sent in response to an email request with no email response. Further, there is no record of mailing to demonstrate that a commencement package was sent through a method reasonably calculated to ensure receipt. Finally, the package was not completed and returned, and Ms. Helton maintains that she did not request or receive a commencement package in 2001. Thus, there was not substantial evidence

20

to support the administrator's findings as to the request for, and distribution of, the 2001 commencement package.

Finally, the findings about the request for, and distribution of, the commencement package in 2009 are not supported by substantial evidence. In discussing the distribution of the commencement package in 2009, there is no acknowledgment or consideration of the fact that Ms. Helton did not initially receive the package and, only after she followed up on her request, was she sent another package that she actually received. The circumstances surrounding this initial failed mailing support Ms. Helton's assertion that she has not received communications from AT&T. However, the Committee did not even consider or inquire further into the issues with this mailing.

Accordingly, the Court holds that the Committee abused its discretion in denying Ms. Helton's claim because the Committee did not engage in a reasoned, principled decision-making process, and the decision is not supported by substantial evidence. Therefore, the Court finds in favor of Plaintiff and against Defendants on Count I and holds that Ms. Helton is entitled to recover the retroactive benefits she seeks.

B. Count II

The Court holds that Defendants failed to comply with ERISA's reporting and disclosure provisions in violation of 29 U.S.C. § 1022 and its interpreting regulations regarding the material changes to the Plan. ERISA and its interpreting regulations require deferred vested participants to be notified of material changes to a plan's eligibility rules within 210 days of the end of the plan year in which the change is adopted. 29 U.S.C. § 1022; *see* 29 C.F.R. 2520.104b-3. Plan administrators must "use measures reasonably calculated to ensure actual receipt of the material

21

by plan participants," and such materials "must be sent by a method or methods of delivery likely to result in full distribution." 29 C.F.R. § 2520.104b-1(b)(1).

Here, the Court finds that Defendants violated their disclosure obligations because the 1998 SPD was not distributed to Ms. Helton in a manner reasonably certain to ensure actual receipt. As an initial matter, the 1998 SPD is the only communication that would qualify in substance and timeliness under the applicable disclosure provisions because it is the only communication disclosing changes to the Plan that Defendants sent within 210 days of the end of the 1997, the year in which the changes are adopted. In addition, based on a preponderance of the evidence, the Court finds that Defendants did not distribute the 1998 SPD in a manner reasonable certain to ensure Ms. Helton's actual receipt. First, the Court cannot find by a preponderance of the evidence that the 1998 SPD was mailed to deferred vested participants. Mr. Adam testified that the 1998 SPD was mailed to all active plan participants, which he defined as all active employees. He testified that the 1998 SPD was not mailed to deferred pensioners. Ms. Helton was a deferred pensioner, not an active employee in 1998, so she was not even part of the selected group to whom the 1998 SPD was to be sent. Second, Defendants failed to produce any physical evidence demonstrating how the mailing process they used was executed for the 1998 mailing or showing that Ms. Helton was included on the mailing list used for this mailing. Finally, Ms. Helton testified and has consistently maintained that she did not receive the 1998 SPD. Based on the evidence presented at trial, the Court finds that Defendants did not mail Ms. Helton the 1998 SPD in a manner reasonably calculated to ensure actual receipt, thereby violating its ERISA disclosure obligations.[2]

C. Count III

---

[2] Accordingly, the Court need not address whether the 1998 SPD provided fair notice as required.

The Court holds that Defendants breached their fiduciary duty under ERISA by failing to correct Plaintiff's misunderstanding of the Plan's eligibility requirements; however, she is not entitled to damages on this claim because she is entitled to such relief under Count I, and awarding her monetary damages would serve as a double recovery and not "appropriate relief." The Court will award her only the requested declaratory relief in connection with this claim.

29 U.S.C. § 1104 sets forth fiduciary duties associated with the administration of a retirement benefits plan. 29 U.S.C. § 1104. "Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001) (citations omitted); *see Faircloth v. Lundy Packing Company*, 91 F.3d 648, 656 (4th Cir. 1996). "Under common law trust principles, a fiduciary has an unyielding duty of loyalty to the beneficiary." *Griggs,* 237 F.3d at 380 (citation omitted). "Naturally, such a duty of loyalty precludes a fiduciary from making material misrepresentations to the beneficiary." *Id.* (citations omitted). "However, a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary." *Id.* "ERISA administrators have a fiduciary obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.'" *Id.* (quoting *Harte v. Bethlehem Steel Corp.,* 214 F.3d 446, 452 (3d Cir. 2000)).

"Moreover, a fiduciary is at times obligated to affirmatively provide information to the beneficiary. *Id.* "The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Id.* (citation and internal quotation marks omitted). "The common law of trusts identifies two instances where a trustee is under a "duty to inform." *Id.* "First, a fiduciary has a duty to give

23

beneficiaries upon request complete and accurate information as to the nature and amount of the trust property." *Id.* (citation and internal quotation marks omitted); *Faircloth*, 91 F.3d at 656. "Second, in limited circumstances, a trustee is required to provide information to the beneficiary even when there has been no specific request." *Griggs,* 237 F.3d at 380 (citation and internal quotation marks omitted).  Generally, the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information; however, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection. *Id.*  Beneficiaries are always entitled to information that is reasonably necessary to enable them to enforce their rights under the trust or to prevent or redress a breach of trust. *Faircloth*, 91 F.3d at 656.  "In sum, the duty to inform entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Griggs*, 237 F.3d at 380 (citation and internal quotation marks omitted.)   "[A]n ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent-especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions." *Id.* at 381.

Congress provided individual beneficiaries with an avenue to seek equitable relief for a breach of fiduciary duty under ERISA.  *Id.* at 385.  Specifically, ERISA § 502(a)(3) provides: "A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3); *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 103 (4th Cir. 2006).  "The phrase 'appropriate equitable relief' encompasses

24

those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Griggs*, 237 F.3d at 385 (quotation omitted). The phrase "any other equitable relief as the court deems appropriate" has been limited to back pay, injunctions and other equitable remedies and not to allow awards for compensatory or punitive damages. *Id.* (citation and internal quotation marks omitted).

"However, even if the redress sought by a beneficiary under ERISA § 502(a)(3) is a classic form of equitable relief, it must be *appropriate* under the circumstances." *Id.* at 385. "For example, such relief is not "appropriate" equitable relief where Congress elsewhere provided adequate relief for a beneficiary's injury and there is no need for further equitable relief." *Id.* (citation and internal quotation marks omitted); *see Korotynska*, 474 F.3d at 105 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 116 S. Ct. 1065 (1996)). Essentially, the provision creates a "catchall" that "acts as a safety net, offering appropriate equitable relief for injuries caused by violations that § 1132 does not elsewhere adequately remedy." *Korotynska*, 474 F.3d at 105 (quoting *Varity*, 516 U.S. at 512, 116 S. Ct. 1065) (internal quotation marks omitted). Thus, where there is already adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, and, therefore, such relief would not be "appropriate." *Id.* (quoting *Varity*, 516 U.S. at 515, 116 S. Ct. 1065).

Here, the Court holds that Defendants breached their fiduciary duty by not responding to Plaintiff's March 2001 question and apparent misunderstanding about the Plan's eligibility requirements; however, the Court does not award Plaintiff any damages on this claim because she is recovering adequate relief on her claim under Count I, as discussed above. First, Defendants failed to respond to Ms. Helton's question as set forth in Diane Ahlin's March 14, 2001 email, in which she asked whether it was true that she is not entitled to her benefits until

age 65. Even if Defendants sent out other notifications of the Special Update, and Ms. Helton had received them, this question demonstrates that she was still operating under the misunderstanding that she was not entitled to benefits until age 65. Defendants had the duty to correct her misunderstanding and inform her that the Plan had changed, such that she was eligible to receive benefits at age 55. Defendants' failure to properly inform Plaintiff and correct her misunderstanding of her rights under the Plan constitutes a breach of their fiduciary duty.

Second, the Court rejects Defendants' position that Plaintiff is not entitled to relief on this claim as a matter of law as she otherwise has an adequate remedy for her claim for benefits because this claim addresses Defendants' failure to uphold their fiduciary responsibilities and does not relate to any of Defendants' other obligations under ERISA. This claim is not a claim for the wrongful denial of benefits to which she is entitled under the Plan, nor is it a claim for violation of ERISA's specific disclosure requirements, which would both be governed by other specific ERISA provisions. *See, e.g., Korotynska*, 474 F.3d 101 at 107 (holding that § 1132(a)(1)(B) affords a plaintiff adequate relief on a claim for wrongful denial of benefits, so a cause of action for breach of fiduciary duty under § 1132(a)(3) is not appropriate); *Faircloth*, 91 F.3d 648 at 656-58 (refusing to allow Plaintiff to state a claim a breach of fiduciary duty claim for a plan's failure to provide information because ERISA has specific provisions concerning a plan's disclosure obligations). Rather, this breach of fiduciary duty claim arises out of Defendants' failure to correct Plaintiff's apparent and material misunderstanding of the Plan's eligibility requirements, for which she cannot seek a remedy under a different ERISA provision. While the appropriate remedy for Plaintiff's fiduciary duty claim may be an award of retroactive benefits, which is the relief she requests on her claim for wrongful denial of her claim for benefits, this similarity in relief does not necessarily show by itself that the claims are the same.

26

Accordingly, Plaintiff's claim does not fail as a matter of law, and the Court finds that Defendants breached their fiduciary obligations to provide complete and accurate information, to ensure that Plaintiff has the information necessary to enforce her rights, and to correct Ms. Helton's material misunderstanding of her rights under the Plan.

However, the Court holds that Plaintiff is not entitled to monetary relief on this claim because the Court awarded her the retroactive benefits she seeks on her claim for improper denial of retroactive benefits, and another recovery of benefits in connection to this claim would not be appropriate equitable relief. The remedy for Defendants' breach of fiduciary duty in this case would be an award of retroactive benefits because they failed to correct the misunderstanding in March 2001, and, if they had told her the correct eligibility requirements, she would have commenced benefits when she became eligible when she turned 55 that October. The Court already awarded Ms. Helton the full amount of retroactive benefits on her claim for improper denial of retroactive benefits under Count I. Thus, allowing her to recover again would not be appropriate relief under the circumstances because it would allow an inequitable double recovery and would essentially improperly transform the remedy on her breach of fiduciary claim to one of compensatory or punitive damages. The Court will award her, however, the requested declaratory relief. Accordingly, the Court holds that Defendants breached their fiduciary duty, that Plaintiff is not entitled to monetary relief on this claim, but that she is entitled to the requested declaratory relief.

## IV. CONCLUSION

For the foregoing reasons, the Court finds in favor of Plaintiff and against Defendants on Counts I, II, and III and awards Plaintiff the relief set forth above.

Accordingly, it is hereby

27

ORDERED that judgment is entered in favor of Plaintiff and against Defendant on Count I. It is further

ORDERED that the Court declares that the Plan Administrator and AT&T Employees' Benefit Committee abused their discretion in denying Ms. Helton's claim for retroactive benefits. It is further

ORDERED that the Court awards Plaintiff $1,279.62 per month for the months between November 2001 and September 2009, for a total of $121,563.90, plus interest on the monthly payments from the date each payment was due.  It is further

ORDERED that judgment is entered in favor of Plaintiff and against Defendants on Count II.  It is further

ORDERED that the Court declares that Defendants breached their duties under 29 U.S.C. § 1022, to distribute an SMM and an updated SPD to Ms. Helton that disclosed changes in the Plan's eligibility requirements.  It is further

ORDERED that judgment is entered in favor of Plaintiff and against Defendants on Count III.  It is further

ORDERED that the Court declares that Defendants breached their fiduciary duties to keep beneficiaries properly informed as set forth in 29 U.S.C. § 1104.  It is further

ORDERED that Plaintiff is entitled to an award of attorneys' fees and costs. In connection with this award, Plaintiff is ORDERED to submit within 10 days proper documentation in support of the fees, *see Robinson v. Equifax Information Svcs.*, LLC, 560 F.3d 235 (4th Cir. 2009), and costs that she seeks for prevailing in this action.

A separate Rule 58 judgment Order will issue with this Memorandum Opinion and Order.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this _____ day of September, 2011.

Alexandria, Virginia

9/  /2011

_____/s/_____
Gerald Bruce Lee
United States District Judge